STATE of Missouri, Respondent,

v.

Raymond R. SCHLAGEL, Appellant.

No. 57425.

Supreme Court of Missouri,
Division No. 2.

Feb. 12, 1973.

John C. Danforth, Atty. Gen., Allan D. Seidel, Asst. Atty. Gen., Jefferson City, for respondent.

John P. Haley, Jr., Kansas City, for appellant.

HENRY I. EAGER, Special Commissioner.

Defendant was convicted by a jury of the sale of a quantity of Lysergic Acid Diethylamide, commonly known as LSD. The jury fixed his punishment at imprisonment for ten years and he was so sentenced. He has duly appealed after the overruling of his motion for a new trial. He was represented at trial and is represented here by employed counsel. Since the appeal was filed before January 1, 1972, we have jurisdiction.

John J. Philpott, a State Highway Patrolman, was assigned to work undercover in an investigation of drug sales in Clay County. He grew a beard and mustache, wore a long-haired wig and, at the times here in question, wore boots and blue jeans. He was assisted by a sixteen-year old youth, described as "Buddy Gately"; the latter, acting on a voluntary basis, would introduce Philpott to persons supposedly selling drugs. On the morning of March 7, 1971, Gately called Philpott and told him that they were supposed to make a "buy" from one Jay Vance at a certain pool hall near the square in Liberty at 1:00 p. m. Gately had talked to Vance that morning, the latter saying that he had the

LSD ready for him; Philpott had met the defendant Schlagel in North Kansas City on the previous day. Gately and Philpott went to the pool hall and at about 1:15 Vance and defendant Schlagel came in. Philpott had seen Vance previously but had not met him. Upon arriving at the pool hall with Schlagel, Vance said that "they" had the stuff out in the car, and that Philpott and Gately should come on out and get in. Philpott and Gately did so, entering a car which Schlagel drove and which belonged to his father. Vance sat in front, Philpott sat behind Vance. Gately did "most of the talking." They drove along nearby streets. Soon after entering the car Schlagel, defendant here, reached up above or behind the sun visor, took out two sheets of "blotter acid" and handed them back to Philpott. These were sheets of blotter paper divided into squares, into each of which had been dropped some material. Philpott "counted the dots" and there were 201; he and Vance then discussed the price, which Vance said would be $235; Philpott took from his pocket $240 in $20 bills, tried to give it to Schlagel "because he handed me the stuff," but he did not take it, so Philpott gave it to Vance. The latter could not make the change, so Schlagel took four one-dollar bills out of his pocket and handed them to Philpott. (The one dollar difference is not explained but is immaterial.) Gately had told Philpott that the material was LSD, and that there should be 201 "hits." Schlagel stated to Philpott during the ride that it was the "same stuff" he had "bought the day before." This evidence was objected to but no point is made on this appeal as to its admissibility. Evidence was also admitted over objection that Philpott had bought 100 "hits" of LSD from defendant on March 6, 1971, and that defendant went to Grandview to get it. The admissibility of this evidence has not been briefed and the objection has not been preserved; therefore, we consider the evidence. The theory of its admission was evidently to show knowledge on the part of defendant concerning the sale on March 7.

There was also evidence that during the ride on March 7 there was some discussion of buying "speed," that Vance said he could get some, and that defendant stated that *he*, Schlagel, would have to go to Warrensburg to get it; heroin was also discussed; Vance said that it could be obtained through a dealer in Kansas City, but Schlagel said he would not deal on that.

The blotter sheets were delivered to a Sergeant of the Highway Patrol who took them to the Kansas City Police Laboratory for analysis. The sheets and their container were duly marked at each step and, although the identity was questioned by objection, no such point is made here. The Police Department chemist testified in detail to his various tests; and specifically to the fact that the material in or on the blotters was Lysergic Acid Diethylamide or LSD; he was cross-examined most extensively. It was also shown that LSD is one of the prohibited or restricted drugs listed by the Missouri Department of Health,—as an hallucinogenic drug, under authority of Missouri law, and registered as such with the Secretary of State. Section 195.230, RSMo 1969, V.A.M.S. The blotter sheets were sent after analysis to the office of the Prosecutor of Clay County where they were kept until these proceedings were begun. They were received in evidence at the trial as exhibits. Certain other facts and details of the trial will be referred to in the discussion of appellant's points.

■ The first point made is that the Court erred in overruling defendant's motion for acquittal. Defendant offered no evidence. Counsel says that the State did not prove a sale of LSD by Schlagel to Philpott. This argument seemed to be divided into two parts: (1) that the sale was made between Vance and Philpott with defendant playing no material part; and (2) that if a sale was made it was completed when Gately and Vance negotiated earlier

and agreed on the transaction, leaving only delivery and payment to be made later. Counsel notes that defendant was not even shown to have been present at the earlier negotiations. We may dispose of the latter contention summarily. The principle involves primarily a question concerning the time when, in civil law, a contract becomes valid and enforceable. It can have no material effect in a criminal case where, pursuant to prior negotiations, a contraband article is delivered and paid for. Under our facts the sale occurred in the car on the afternoon of March 7. Defendant cites 72 C.J.S. Poisons § 11, p. 186, which refers to a federal case, Fisk v. United States, CA 6, 279 F. 12. In that case the contraband was delivered at the time when defendant claimed the sale occurred. In Barnett v. United States, CA 9, 171 F.2d 721, it was held that a sale of narcotics is not complete until the property has been delivered or the purchase price paid. (Citing cases.) The sale here was completed in the car on March 7, 1971, the goods delivered, and the purchase price paid. In State v. Davis, Mo., 450 S.W.2d 168, cited by defendant, it was merely held that a sale of prohibited drugs could be made by exchanging them for merchandise rather than cash. This phase of defendant's point one is denied.

The other contention essentially is that defendant played no part in the criminal act, citing State v. Muchnick, Mo.App., 334 S.W.2d 386. There, defendant was charged with unlawfully "permitting" a minor to assist in the sale of intoxicating liquor. The essential holding was that mere negative or passive action is not sufficient and that, although all who participate in a crime are equally guilty, the defendant must have in some way associated himself with the principal by some act of participation, encouragement or support. We look again, briefly, at our facts. Defendant had procured LSD for Philpott on the previous day. He told Philpott on March 7 that the blotter acid then delivered was the "same stuff" which he had

bought on the day before. This was admitted to show knowledge and intent and no question on the admissibility of the testimony has been preserved. Defendant entered the pool hall with Vance, the latter told Philpott and Gately, in defendant's presence, that "they" had the stuff out in the car, and all four then entered a car belonging to defendant's father which was at all times driven by defendant. Defendant reached up behind or above the sun visor, took down the two sheets of "blotter acid" and *gave them to Philpott*; this clearly constituted the delivery, which was and is a material element. Defendant did not accept the money, but made change for Vance by handing Philpott four one-dollar bills, which he took from *his* pocket. Defendant stated (with no objection to the evidence) that he could go to Warrensburg and get them some "speed." On appeal we accept the State's evidence as true, and allow such inferences favorable to the State as may be drawn therefrom. State v. Johnson, Mo., 475 S.W.2d 95. We hold that these facts constituted substantial evidence of a *participation* in the sale by defendant.

Under our law, evidence fairly showing any form of affirmative participation in a crime is sufficient to support a conviction. State v. Cobb (Banc), Mo., 444 S.W.2d 408; State v. Butler, Mo., 310 S.W.2d 952; State v. Ramsey, Mo., 368 S.W.2d 413; State v. Reed, Mo., 453 S.W.2d 946. The usual instruction was given concerning two or more persons acting together with a common intent, and the instruction is not questioned here. It is not necessary that defendant be shown to have performed each and every act. The evidence here was ample for conviction and defendant's motion for acquittal was properly overruled.

The next point is that the Court erred in not questioning the jury as to whether or not any member had read newspaper articles appearing in the Kansas City papers. After the trial had proceeded all day on September 20th, and on the

morning of the 21st, counsel asked the Court to question the jury on this matter. The evidence then was substantially complete. One article had appeared in the Kansas City Star on the evening of September 20th (stated as September 21, apparently in error) and another had appeared in the Kansas City Times on the morning of September 21st. A copy of each was offered in evidence in support of an offer of proof, after the Court had overruled the oral motion. Both articles made reference to the trial proceedings in this case. The afternoon article of September 20th referred to the proceedings in this case, also to "Two other charges * * * pending," recited numerous other and wholly independent proceedings conducted on September 20th, referred to drug arrests of other persons and said that the State "contends" that Schlagel was a major dealer in illegal drugs, but that he had denied that he sold any drugs. The Times article merely related the essence of the testimony on the previous day, but also referred to arrests of others in drug raids in Clay County. Counsel contends that if any member or members of the jury panel had read these articles the effect would be so prejudicial as to be incurable, and that defendant would then have been entitled to a mistrial. We must consider this ruling in the full context of the trial. On voir dire, the members of the panel had been questioned in detail concerning their reading of newspaper articles referring to the drug traffic in Clay County, whether they had seen defendant's name mentioned, and whether they would be influenced by any such articles. One member thought he had seen defendant's name; several had read such articles generally; none thought that he or she would be influenced. Defendant's counsel repeatedly cautioned the jury panel against being influenced by anything except the evidence which would come from the witnesses and the instructions given by the Court. The Court repeatedly cautioned the jury to the same effect during the trial, particularly at recesses. One of the instructions given contained the usual caution that a verdict must be based upon the facts which the jury ascertained from the evidence, and defendant's counsel vehemently cautioned the jury to the same effect in his final argument. Under these circumstances we hold that the Court did not abuse its discretion in declining to question the jury specifically on the matter. See, generally, State v. Keeny, Mo., 431 S.W.2d 95. The evidence had been substantially completed and the Court apparently did not wish to introduce the diversionary results of such an interrogation. Defendant cites the case of Smith v. United States, CA 8, 236 F.2d 260, where the Court did inquire very briefly, and in a more or less leading manner, whether a news article had been read. That case does not pretend to lay down any general rules and each case must be decided on its own facts and in the exercise of the Court's discretion. The point is denied.

■■ Next,—a point dealing with the State's argument and a motion for the discharge of the jury. In substance, the assistant prosecutor said, in referring to LSD: that the jury had heard what it is, and using their common sense, "What do you think that does to the body and to the mind?" Also, that the victims end up as "vegetables" and are "like the living dead." Objection was made that all this was outside the record and was an appeal to passion and prejudice. The objection was overruled. Later, counsel referred to "what it does to the body * * * the mind" and said that the jury could draw an inference from the evidence and their own education, experience and background. Counsel for defendant again objected and moved for a discharge of the jury. The objection was sustained but the motion to discharge was overruled. This was the only motion for a discharge made on that score and the ruling on the motion is the only point made on the subject. The overruling of the original objection is not included. We are not entirely convinced that the argument was improper but we shall assume that it was. The determina-

**86**

tion of such a motion and the consideration of the effect upon the jury of an argument or other conduct of counsel is primarily a matter within the sound discretion of the trial court and, absent a manifest abuse of that discretion, an appellate court should not interfere. Gathright v. Pendegraft, Mo., 433 S.W.2d 299; Harris v. St. Louis Public Service Co., Mo., 270 S.W.2d 850; Brownridge v. Leslie, Mo., 450 S.W.2d 214; Golian v. Stanley, Mo., 334 S.W.2d 88. The Court in its last ruling told the jury, in effect, that the argument was improper. It was within the Court's discretion to rule further that the jury had not been so prejudiced that a mistrial was necessary.

Lastly, complaint is made concerning a remark of the Court which is claimed to have been prejudicial. During cross-examination of the witness Philpott he was asked if he "made the buy from Jay at the pool hall * * *." The State objected that the question invaded the province of the jury and that "the evidence was he bought it from both." The Court said: "That's the way I understood him, he bought it from both of them. One of them gave him the change and the other one took the money. I don't know." Counsel for defendant said: "Your Honor, I didn't understand it that way. Of course, I'll defer to the Court's suggestion." The Court then stated that as he understood, defendant "reached up over the visor and took it down and handed it to him," but that he did not,—"just tell it over again if I'm wrong on that. I could be wrong." Counsel for defendant then interposed that he understood the Court's opinion but that "I'd just like to continue with the questioning if the court has no objection." The Court said: "I thought we had a misunderstanding as to what he said." Counsel: "No." The Court: "Go ahead." Obviously the Court stated the facts correctly; if it indulged in a conclusion beyond that, it immediately offered a full correction or explanation, and counsel declined this. There can be no error under these circumstances.

 We recognize fully the requirement of absolute impartiality imposed upon the trial courts. Here there was actually an attempt to recall the testimony and an offer, if the Court was wrong, to let the witness repeat the facts. Not only was no objection made at the trial but counsel refused any correction or explanation and was allowed to proceed. If there was any error, which we doubt, it has not been preserved; nor could we find that any such error was prejudicial under these circumstances.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.